**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

ZAMEER NOORALLA MOHAMED, aka
Al, aka Samier Hussain, aka
Zameer Mohamed,
            *Defendant-Appellant.*

No. 05-50253

D.C. No.
CR-04-00609-PA

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
February 17, 2006—Pasadena, California

Filed August 11, 2006

Before: Betty B. Fletcher, A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge B. Fletcher

## COUNSEL

Michael Tanaka, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Erik M. Silber, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

## OPINION

B. FLETCHER, Circuit Judge:

On April 23, 2004, Zameer Nooralla Mohamed telephoned the Department of Homeland Security from a hotel room in Calgary, Canada, and made a phony bomb threat, claiming that four of his acquaintances were terrorists involved in a plot to bomb several shopping malls near a federal building in Los Angeles, California. After expending considerable resources to protect against the threat and identify its perpetrator, law enforcement officials located and arrested Mohamed. A district court sentenced him to a prison term of five years for violating 18 U.S.C. § 844(e), which prohibits the use of a telephone to "make[ ] any threat" or "maliciously convey[ ] false information knowing the same to be false" regarding an attempt to "destroy any building, vehicle, or other real or personal property by means of fire or an explosive." Mohamed now appeals his sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm.

# I

Mohamed is a native and citizen of Tanzania. He entered the United States on a tourist visa in 1999. He overstayed his visa and spent four years living and working in Los Angeles, Houston, and Detroit. During this time, he became the subject of an FBI investigation as the result of alleged criminal activities including theft and fraud. This investigation produced evidence connecting him to the fraudulent use of identification cards in Texas and California, the fraudulent use of social security numbers to open bank accounts, and the theft of approximately $13,000 from various individuals, including a former roommate and a former employer. Mohamed eventually left the United States in January of 2003 and crossed the border into Canada, where he worked first in Montreal as a telemarketer and then in Toronto as a customer service agent for the Royal Bank of Canada.

In April of 2004, Mohamed used a telephone calling card to place a call to the Department of Homeland Security. He provided a false name and stated that he was a former member of an al Qaeda cell. He reported that a terrorist group with ties to India and Pakistan was planning an attack on the United States. He named four purported attackers — all acquaintances of his — and said they would be traveling to the United States from Canada on fake passports. He stated that the targets of the attack were several shopping malls near the UCLA campus, close to a federal building in the Westwood area of Los Angeles. Mohamed indicated that the attacks would take place within one week, on April 29, 2004. He claimed he was providing this information to improve his chances of becoming a United States citizen.

In fact, Mohamed knew that the information was false and that there was no planned attack. He later admitted that the hoax was an attempt to impose retribution on the four individuals he named, including a colleague at Royal Bank who owed him money. He explained that he chose Los Angeles as

a target because he was familiar with that location from time spent in Los Angeles. He admitted that neither he nor any of the four individuals he named had ever been a member of a terrorist organization. He further confessed that he got the idea for the hoax when, following a confrontation with his colleague, he spotted a government poster with a terrorist-tip hotline at a bus station in Calgary. Although he contends that he had no intention of committing any act of terrorism, he admits that he wanted the threat to be taken seriously because he was angry at his acquaintances and wanted them to "go to jail."

Law enforcement agencies took the threat seriously, indeed, and devoted substantial resources to investigating and preventing the purported attack. The organizations that investigated the threat and provided additional security on the day of the threatened attack included: the FBI Joint Terrorism Task Force, four divisions of the Los Angeles Police Department (LAPD), the Los Angeles County Sheriff's Department, the Los Angeles City Fire Department, the California Highway Patrol, the United States Border Patrol, and the Royal Canadian Mounted Police. Officials detained and questioned Mohamed's acquaintances in connection with the threatened terrorist strike. In addition, the hoax disrupted business in the targeted areas. Various media outlets broadcast news of the threat, and the LAPD distributed flyers to warn local businesses about the purported impending attack. Business owners at or near the targeted shopping mall reported that the hoax "completely shut down business," with some estimating that the bomb threat reduced sales by as much as sixty-five or eighty-five percent and that it reduced foot traffic in the affected shopping mall by thousands of people.

By tracing the origin of the calling card used to place the threat, as well as records from the hotel from which the call was made, the government identified Mohamed as the perpetrator of the hoax. Border patrol agents ultimately located him on a farm near Scobey, Montana, where he had just reentered

the country. The government filed a one-count indictment against Mohamed, alleging a violation of 18 U.S.C. § 844(e), and subsequently amended the indictment to include an allegation that "the offense resulted in a substantial disruption of public, governmental, or business functions or services." Mohamed pled guilty.

The presentence investigation report (PSR) recommended a sentencing range of twelve to eighteen months. First, the PSR started with a base offense level of twelve for the violation of 18 U.S.C. § 844(e). *See* U.S.S.G. § 2A6.1(a). Next, it added a four-level increase because Mohamed's hoax resulted in "a substantial disruption of public, governmental, or business functions or services." *Id.* § 2A6.1(b)(4). It then subtracted three levels for Mohammed's acceptance of responsibility. *Id.* §§ 3E1.1(a), (b). These calculations produced a total offense level of thirteen, which, combined with Mohamed's Category I criminal history, yielded a sentencing range under the advisory guidelines of twelve to eighteen months.

In response to the PSR, the government urged the district court to award only two points, rather than three, for acceptance of responsibility. Further, the government sought an upward departure of twelve levels because of the unusually disruptive nature of the hoax. Taking these two calculations into account, the government recommended a sentence of seventy-eight months, at the high end of the applicable guidelines range. Mohamed argued that the PSR's suggested range already included an enhancement for the disruption caused by the hoax and that any additional enhancement based on that aspect of the crime would be inappropriate. He requested the judge to impose a sentence within the PSR's suggested range.

At sentencing, the district court found that the advisory guideline range of twelve to eighteen months did not reflect the seriousness of Mohamed's crime. The judge stated that an enhanced sentence was necessary "because of the significant

disruption of governmental functions caused by the Defendant's conduct, the seriousness of the conduct in light of the events of the September 11th [attacks], the importance of deterring others from such reckless behavior, the harm caused to, literally, hundreds, if not thousands, of people, innocent people in this city, and the harm caused . . . to the four individuals targeted by this Defendant." Accordingly, the district court applied an eight-level "upward adjustment." This adjustment brought the total offense level to twenty-one, which produced an advisory guidelines range of thirty-seven to forty-six months.

Even with the eight-level upward adjustment, however, the district court still felt that "the circumstances of this case warrant a period of incarceration greater than that contemplated by the advisory guidelines." The district court recited the sentencing considerations set forth in 18 U.S.C. § 3553(a) and stated that it had considered the application of these sentencing goals to the facts of Mohamed's case. In explaining its decision to impose a sentence beyond the guidelines range, the district court pointed to the defendant's personal history and to the extraordinary impact of the threat. The court noted the defendant's past conduct, which included "use of aliases," "money that's turned up missing," and "a history of engaging in little penny-ante [criminal] conduct." The district court concluded that Mohamed was "nothing more than a small-time thief and con man" and that it was necessary to impose a "sufficiently punitive custodial sentence . . . to afford protection to the public." The court also stated that the sentence would have been even higher "but for your lack of criminal history." Finally, the court noted "the heightened gravity and seriousness of this offense in the context of September 11th, and the importance of deterring others from such reckless conduct." Again, it noted that the threat "scared people, disrupted local businesses as well as local and federal law enforcement . . . [and] targeted four innocent people." Ultimately, the court decided "that a 60-month sentence reflects the seriousness of this offense, will promote respect for the

law, and will protect the public from you and will serve as a deterrent to others." Exercising its discretion under *United States v. Booker*, 543 U.S. 220 (2005), the district court imposed a sixty-month sentence.

Mohamed now appeals. He argues that his sentence violates due process and is unreasonable under *Booker*.

## II

Mohamed contends that his sentence runs afoul of ex post facto principles. He notes that he committed his crime when the sentencing guidelines were mandatory, that the Supreme Court subsequently rendered the guidelines advisory in its decision in *United States v. Booker*, *see* 543 U.S. at 245, and that the district court exercised its new-found discretion under *Booker* to impose a harsher sentence than the madatory guidelines had allowed. Thus, the effect of *Booker* was to allow a lengthier sentence than the law would have permitted at the time Mohamed committed the crime, a result that he argues is constitutionally impermissible.

**[1]** Mohamed's argument, however, is foreclosed by *United States v. Dupas*, 417 F.3d 1064 (9th Cir. 2005), *amended by*, 419 F.3d 916. In that case, we explained that, in the Ninth Circuit, due process limitations on the retroactive application of judicial decisions apply "only to after-the-fact increases in the scope of criminal liability *and not to retroactive sentence enhancements*." *Id.* at 920 (quoting *Holgerson v. Knowles*, 309 F.3d 1200, 1202 (9th Cir. 2002) (citing *United States v. Newman*, 203 F.3d 700, 703 (9th Cir. 2000))). We therefore rejected the defendant's argument that his post-*Booker* sentence was unconstitutional, even though it allowed the district court to impose punishment under a different sentencing regime than would have been used at the time of the crime's commission. *Dupas* squarely controls the outcome here, and we are bound by that decision. Even though the retroactive application of *Booker* may have resulted in a harsher sentence

than would have been imposed under the governing law at the time Mohamed made his bomb threat, *Dupas* compels us to hold that this result does not violate the Due Process Clause. *See also United States v. Mix*, 2006 WL 1549737, at *6-7 (9th Cir. June 8, 2006); *United States v. Staten*, 2006 WL 1542835, at *4 (9th Cir. June 7, 2006).

## III

Mohamed also asserts that his sentence is unreasonable under *Booker*. He notes that the sixty-month sentence imposed by the district court was several times longer than any sentence he could have received under the applicable guidelines range, and he argues that district court's justifications for imposing this longer sentence — his past "penny-ante" criminal conduct, the need to protect the public from him, the need to provide both general and specific deterrence for crimes as reckless as his bomb threat, the comparatively serious and harmful nature of the threat in an age of terrorism, and the substantial disruption caused by the hoax — were insufficient to sustain the sentence and improperly duplicative of factors that were already taken into account by the advisory guidelines.

*A.*

**[2]** We pause here to discuss our approach to reviewing post-*Booker* sentences. As is well known by now, the Supreme Court's decision in *Booker* marked a major transformation in the law of federal criminal sentencing. A five-Justice majority concluded in *Booker* that the system of mandatory guidelines was unconstitutional because it violated the Sixth Amendment's requirement that "[o]ther than the fact of a prior conviction, any fact that increases the [maximum penalty to which a defendant may be subjected] must be submitted to a jury, and proved beyond a reasonable doubt." 543 U.S. at 231 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). A different five-Justice majority, however, con-

cluded that the appropriate remedy for this constitutional defect was not to eliminate judicial factfinding nor to require a standard of reasonable doubt in sentencing proceedings, but to make the sentencing guidelines "effectively advisory." *Id.* at 245. After excising those portions of the Sentencing Reform Act that had made the guidelines mandatory, the *Booker* Court inferred from the provisions that remained "a practical standard of review already familiar to appellate courts: review for 'unreasonable[ness]' " *Id.* at 261 (citing 18 U.S.C. § 3742(e)(3) (1994 ed.)). The Court thus instructed that district courts "must consult" the now-advisory guidelines, even though they are not bound by them, *id.* at 264, and it held that sentences are subject to review to determine "whether a sentence is unreasonable" in light of the "numerous factors" set forth in 18 U.S.C. § 3553(a), including the applicable advisory guidelines range. *Id.*

Consistent with the Supreme Court's remedial holding, we review post-*Booker* criminal sentences in two steps. First, we determine whether the district court properly calculated the applicable range under the advisory guidelines.[1] *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006); *see also United States v. Kimbrew*, 406 F.3d 1149, 1151-52 (9th Cir. 2005). In evaluating the district court's application of the advisory guidelines, we review its construction of the guidelines *de novo* and we review any factual findings made by the district court for clear error. *Cantrell*, 433 F.3d at 1279. We review the district court's application of the guidelines to the facts of the case for abuse of discretion. *Id.* If the district court improperly applied the advisory guidelines and the error in application was not harmless, we will remand for resentencing. *Id.*; *see also* 18 U.S.C. § 3742(f)(1) (requiring remand

---

[1]We have reserved judgment on the question of whether there are instances in which a precise calculation under the guidelines might be unnecessary to satisfy *Booker*'s requirement that the district courts "must consider" the advisory scheme, and we do not address that issue here. *See Cantrell*, 433 F.3d at 1279 n.3.

"for further sentencing proceedings" upon a finding that the district court applied the guidelines incorrectly).

Second, whether the district court imposed a sentence inside or outside the applicable advisory range, we determine whether the sentence is reasonable. *Cantrell*, 433 F.3d at 1279; *see also United States v. Plouffe*, 436 F.3d 1062, 1063 (9th Cir. 2006), *as amended*, 445 F.3d 1126 (establishing jurisdiction to review sentences within the advisory guidelines). We have previously explained that district courts must provide specific reasons for their sentencing decisions, such that the record on appeal demonstrates explicit or implicit consideration of the sentencing factors set forth in § 3553(a). *See* 18 U.S.C. § 3553(c); *United States v. Miqbel*, 444 F.3d 1173, 1181-82 (9th Cir. 2006); *United States v. Menyweather*, 431 F.3d 692, 701 (9th Cir. 2005), *as amended*, 447 F.3d 625; *see also United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc).

**[3]** We have not yet had occasion to consider, however, how to review post-*Booker* sentences, such as the one involved in this case, in which a district court purports to "depart" under the guidelines. Here, we distinguish a *departure*, by which we mean the authority of district courts under the pre-*Booker* sentencing regime to issue a sentence outside of the applicable mandatory guidelines range, from an exercise of *discretion*, by which we mean the authority of district courts, post-*Booker*, to impose sentences outside of the advisory guidelines range. An exercise of *discretion* to sentence outside of the advisory guidelines is reviewed, just like a decision to sentence inside of the applicable range, for reasonableness. *See, e.g.*, *United States v. Williamson*, 439 F.3d 1125, 1140-41 (9th Cir. 2006). It is still an open question of law, however, how this court reviews so-called post-*Booker* "departures."[2]

---

[2]In *United States v. Menyweather*, this court reviewed a sentence imposed prior to *Booker* that involved a downward departure. We con-

We note that other circuits have different approaches to whether "departures" still apply following the Supreme Court's decision in *Booker* and, if so, how they should be reviewed. The Seventh Circuit, for example, has declared that "the concept of 'departures' has been rendered obsolete in the post-*Booker* world." *United States v. Arnaout*, 431 F.3d 994, 1003 (7th Cir. 2005). Because departures were designed to define narrowly the limits within which the district courts could impose sentences outside the formerly mandatory guidelines, the Seventh Circuit has held that departures are no longer relevant in a post-*Booker* regime where district courts enjoy authority, within the bounds of reason, to impose sentences that fall inside or outside the now-advisory guidelines. *Id.* By contrast, other circuits have held that departures are still an important part of the post-*Booker* sentencing system and that district courts must still assess their authority to depart under the advisory guidelines. *See United States v. Selioutsky*, 409 F.3d 114, 118-19 (2d Cir. 2005); *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005); *United States v. Hawk Wing*, 433 F.3d 622, 631 (8th Cir. 2006); *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). These circuits have concluded that the provisions of the guidelines relating to departures, non-binding as they are, remain "a relevant consideration for determining the appropriate Guideline sentence." *United States v. McBride*, 434 F.3d 470, 476-77 (6th Cir. 2005). They have not, however, agreed upon a uniform standard for evaluating such post-*Booker*

---

cluded that the pre-*Booker* departure should be reviewed, post-*Booker*, for abuse of discretion. 447 F.3d at 630-31. The *Menyweather* panel went on to conclude, however, that any abuse of discretion in the district court's decision to depart downward was harmless. *Id.* at 632-34. It noted that the district court had demonstrated its determination to impose a sentence of probation, concluded that the sentencing judge would have exercised his newfound discretion under *Booker* to impose the same sentence on remand, and held that the sentence was reasonable under *Booker*. *Id.* at 635-36. *Menyweather* clearly stated, however, that it did not purport to address the question of whether and how to review post-*Booker* departures. *Id.* at 630 n.1.

departures. *Compare Selioutsky*, 409 F.3d at 119 (reviewing for abuse of discretion), *with Jackson*, 408 F.3d at 304 (reviewing for reasonableness), *and Crawford*, 407 F.3d at 1178 (reviewing *de novo*).

We think the better view is to treat the scheme of downward and upward "departures" as essentially replaced by the requirement that judges impose a "reasonable" sentence. The discretion that the district court judge employs in determining a reasonable sentence will necessarily take into consideration many of the factors enumerated in Section 5K of the Sentencing Guidelines, but to require two exercises — one to calculate what departure would be allowable under the old mandatory scheme and then to go through much the same exercise to arrive at a reasonable sentence — is redundant. In addition, the use and review of post-*Booker* departures would result in wasted time and resources in the courts of appeal, with little or no effect on sentencing decisions. After all, if a district court were to employ a post-*Booker* "departure" improperly, the sentencing judge still would be free on remand to impose exactly the same sentence by exercising his discretion under the now-advisory guidelines. Such a sentence would then be reviewed for reasonableness, in which case it is the review for reasonableness, and not the validity of the so-called departure, that determines whether the sentence stands. *See Hawk Wing*, 433 F.3d at 633 (Loken, C.J., concurring) (arguing that the task of reviewing post-*Booker* departures "unduly complicates our appellate task and may compel a significant number of essentially meaningless remands"). Further, even if a district court judge were to misapply a departure, this error would still be subject to harmless error review. *See Menyweather*, 447 F.3d at 632-34; *Cantrell*, 433 F.3d at 1279. Presumably, this court would then review the sentence for reasonableness to determine whether the improper departure was harmless. If we were to declare the sentence reasonable, then the erroneous departure would be harmless. *See, e.g.*, *Menyweather*, 447 F.3d at 634. If we were to declare the sentence unreasonable, then the sentence would

be invalid both because of the erroneous departure *and because it is unreasonable*. In any case, our review of the so-called departure would have little or no independent value.

[4] For these reasons, we side with the Seventh Circuit and we elect to review the district court's application of the advisory sentencing guidelines only insofar as they do not involve departures. To the extent that a district court has framed its analysis in terms of a downward or upward departure, we will treat such so-called departures as an exercise of post-*Booker* discretion to sentence a defendant outside of the applicable guidelines range. In other words, any post-*Booker* decision to sentence outside of the applicable guidelines range is subject to a unitary review for reasonableness, no matter how the district court styles its sentencing decision.

[5] We do not mean to suggest, however, that the pre-*Booker* system of departures should be ignored. That system reflected the Sentencing Commission's judgment about what types of considerations should or should not take a case out of the "heartland of typical cases" such that an extra-guidelines sentence would be justified. *Koon v. United States*, 518 U.S. 81, 94 (1996). If a district court's reasons for exercising its post-*Booker* discretion coincide with the factors allowed or encouraged under the pre-*Booker* system of departures, such overlap may suggest that the sentencing decision was reasonable. *See Hawk Wing*, 433 F.3d at 633 (Loken, C.J., concurring) ("The district court must give reasons for sentencing outside a properly determined guidelines range. Explaining whether those reasons are consistent with prior limitations on the court's departure authority under the mandatory guidelines will obviously assist this court in determining on appeal whether the sentence is reasonable . . . ."). Our holding today does not preclude consultation of the system of departures that existed under the mandatory regime, either by the district court or by this court. Rather, out of a recognition that the concept of formal departures has become anachronistic, we hold that any deviation from the applicable advisory

guidelines range will be viewed as an exercise of the district court's post-*Booker* discretion and reviewed only for reasonableness.

### B.

**[6]** Applying these principles to the facts of Mohamed's case, we find that the district court properly calculated the applicable range under the advisory guidelines. The court correctly identified Mohamed's base offense level for the bomb threat, U.S.S.G. § 2A6.1(a), there was ample evidence to support the four-level enhancement for "a substantial disruption of public, governmental, or business functions or services," *id.* § 2A6.1(b)(4), and the district court was well within its discretion to award a reduction of three points for Mohammed's acceptance of responsibility, *id.* §§ 3E1.1(a), (b).

**[7]** The more difficult question in this case is whether the sentencing court's decision to impose a sixty-month sentence, which far exceeded the advisory guidelines range of twelve to eighteen months, was reasonable. We hold that it was. Although the sentence imposed is substantially higher than what the advisory guidelines had recommended, we are satisfied that the district court acted reasonably when it decided to go outside those guidelines and impose a five-year sentence.

**[8]** We note initially that the sentencing guidelines anticipate their own inadequacy in the context of bomb threats. "The [Sentencing] Commission [has] recognize[d] that this offense includes a particularly wide range of conduct and that it is not possible to include all of the relevant circumstances in the offense level." United States Sentencing Guidelines Manual § 2A6.1 cmt. 3(A). Thus, the very nature of the crime in this case suggests the limitations of the advisory guidelines and recommends a careful assessment of the facts. Here, the sentencing court's decision reflects careful application of the sentencing factors set forth in 18 U.S.C. § 3553(a) to the facts of Mohamed's case, as the Supreme Court's deci-

sion in *Booker* requires. For example, the district court explicitly noted that it had "examined and considered the nature and circumstances of the offense" and found that the advisory guidelines did not accurately reflect the seriousness of Mohamed's crime. *See* 18 U.S.C. § 3553(a)(2)(A). It noted both the extraordinary callousness and costliness of the threat. The court observed that Mohamed had exploited the nation's fear of al Qaeda in light of the terrorist attacks of September 11, jeopardized the welfare of four innocent individuals, and frightened and affected thousands of people in southern California, all in an effort to harass acquaintances with whom Mohamed was displeased. The court further described how, as a result of Mohamed's threat, "multiple law enforcement agencies were mobilized" and local businesses shut down. The PSR details some of the costs of law enforcement and lost business as a result of the threat, noting that the targeted mall spent $24,000 for additional security on the day of the attack, that an officer from the LAPD estimated that the department expended more than $50,000 in resources to prevent the bombing, and that businesses in the affected areas typically had their revenues and their customer traffic reduced that day by approximately forty percent.

[9] Also, Mohamed's criminal history was not in the "heartland" of Category I. The district court noted that the guidelines failed to take into account "the history and characteristics of the defendant" and the need to provide the public with adequate protection from him. *See* 18 U.S.C. §§ 3553(a)(1), (2)(C). While the PSR rated Mohamed as having a minimal criminal history, the record suggests that he has engaged in a more extensive pattern of misconduct. A federal investigation had linked him to the fraudulent use of driver's licenses in Texas and in California, to the theft of $13,000 from a restaurant in Houston where he was briefly employed, to the fraudulent use of a social security number to open an account at the Bank of America, and to a failure to report for an interview with the FBI regarding other suspicious activities. On top of this, the defendant had been living illegally in

the country for several years and had reentered the country illegally just prior to his arrest. On this record, we find that it was reasonable for the district court to conclude that the advisory guidelines did not adequately take into account Mohamed's significant history of increasingly serious criminal activity.

**[10]** The degree of the district court's deviation from the advisory guidelines, though considerable, was also reasonable on the facts of this case. We note that the five-year sentence imposed was only half of the ten-year statutory maximum for a conviction under 18 U.S.C. § 844. Finally, we note that other courts have approved substantial departures for serious bomb threats, even under the mandatory regime in place prior to *Booker. See, e.g.*, *United States v. Barresi*, 361 F.3d 666, 674 (2d Cir. 2004) (finding that an eight-level departure was not unreasonable where the defendant had falsely accused an acquaintance of involvement in the September 11 attacks); *United States v. Leung*, 360 F.3d 62, 71-72 (1st Cir. 2004) (approving a six-level departure and a forty-eight-month sentence for a defendant who had exploited the victims of the September 11 attacks to commit identity fraud). *But see United States v. Horton*, 98 F.3d 313, 319 (7th Cir. 1996) (holding that an eight-level increase in the offense level was unreasonable where the defendant had made a threat on a federal building immediately after the bombing in Oklahoma City, resulting in a substantial disruption of governmental functions).

**[11]** In sum, we consider Mohamed's sixty-month sentence reasonable. As the Seventh Circuit concisely explained, "reasonableness is a range, not a point." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). "If the judge could, without abusing his discretion, have ruled in the defendant's favor, the defendant is entitled to insist that the judge exercise discretion, though he cannot complain if the exercise goes against him." *Id.* Discretion is a double-edged sword, and a district court may exercise its discretion as much to the detri-

ment of a defendant as to the benefit. *See Menyweather*, 447 F.3d at 634-36 (approving a sentence of probation where the applicable guidelines had recommended a range of twenty-one to twenty-seven months). Where, as here, the district court has thoroughly explained its decision to deviate from the advisory guidelines and the sentence it has imposed is justified by the unique facts of the case, we will uphold the sentence.

**IV**

Mohamed's two objections to his sentence are without merit. The retroactive application of *Booker* does not violate the constitutional guarantee of due process, *see Dupas*, 419 F.3d at 920, and the sixty-month sentence imposed by the district court was reasonable given that the advisory guidelines did not adequately account for the extremely serious nature of Mohamed's hoax and his history of criminal activity. The judgment of the district court is **AFFIRMED**.