**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

MARSHALL ZOLP, a/k/a GARY
ANDERSON, TUCKER BINKLEY, JOHN
CASSIDY, ROBERT CASSIDY,
MARCELINO COLT, JOHN DOUGLAS,
MARCELINO FERNANDEZ, MARSHALL
HAMILTON, JOHN HANCOCK, JOHN
LEHMAN, MARSHALL MCCRAE,
MARSHALL MCCRAY, MARSHALL
NEMITZ, ALEX SEAGROVE, FRANK
TULLY, WERNER WASSLER, MARTIN
WELLINGTON, DON WELLS and
MARSHALL VON ZOLP,
            *Defendant-Appellant.*

No. 05-50882

D.C. No.
CR-03-00803-RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
January 11, 2007—Pasadena, California

Filed March 13, 2007

Before: Andrew J. Kleinfeld, Raymond C. Fisher, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Smith

**COUNSEL**

Elizabeth A. Newman, Deputy Federal Public Defender, Los Angeles, California, for the defendant-appellant.

Ellyn M. Lindsay, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

SMITH, Circuit Judge:

Defendant-appellant Marshall Zolp appeals the district court's sentence following his plea of guilty to federal securities fraud. Zolp challenges two aspects of his sentencing pro-

ceedings: (1) the district court's factual finding that the involved stock was "worthless" after the fraud came to light, and (2) the district court's decision to consider Zolp's cooperation only as part of the larger analysis under 18 U.S.C. § 3553(a) and not as part of the court's advisory guidelines calculation. On the first issue, we vacate and remand. On the second issue, we affirm.

## BACKGROUND

Zolp was a major participant in a "pump-and-dump" scheme[1] involving two related companies: MegaWatt Energy Corp. ("MegaWatt"), a California corporation, and New Energy Corp. ("Original New Energy"), a Utah corporation with offices in San Diego, California. MegaWatt was a privately-held company that purportedly manufactured solar generators. MegaWatt spun-off Original New Energy as another privately-held company to market those generators. With Zolp's assistance, New Energy completed a reverse merger with a publicly-traded company called Ubetigolf, Inc. ("Ubetigolf"). The surviving entity was named New Energy Corp. ("New Energy"), and public trading in New Energy stock began on November 17, 2001. As part of the merger transaction, Zolp was issued 300,000 shares of New Energy stock that he placed in a brokerage account.

In early December 2001, Zolp convinced New Energy's owner to hire an investment advice firm named Magnum Financial Group ("Magnum"). Magnum was associated with Stratos Research, which purported to be a financial research firm that published reports regarding "micro-cap" companies

---

[1]"Pump and dump" schemes "involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market." U.S. Securities and Exchange Commission, Fast Answers: Pump and Dump, *at* http://www.sec.gov/answers/pumpdump.htm. *See also* Thomas Lee Hazen, Law of Securities Regulation, §§ 2.2 n.80, 14.18 (5th ed. 2005).

on its website. On December 14, 2001, Magnum issued a press release announcing that New Energy had hired Magnum. Four days later, Magnum published a research report regarding New Energy based on information that Zolp supplied to Magnum. Magnum then issued a press release regarding New Energy which included a link to the website on which it posted that research report, and distributed the report via email to approximately 8,000 recipients. The research report—with Zolp's knowledge and participation—contained numerous material misrepresentations about New Energy. For example, the report indicated that New Energy had significant purchase orders "in hand" and certain service provider contracts established (it did not); that MegaWatt was a "Green Team Partner" with the Los Angeles Department of Water and Power (it was not); and that New Energy had a joint venture with a Mexican company that was about to secure $92 million in financing from Mexican Coca-Cola bottlers (those negotiations had been on hold for months).

Following the publication of the research report, New Energy's stock rose from $4.75 per share to $7.65 per share by January 2, 2002. Zolp then directed his broker to sell his 300,000 shares and acquire an additional 500,000 shares. Zolp continued to feed false information to Magnum and to investors concerning New Energy which further inflated the stock price, and he continued to sell his own shares in the inflated market. The stock reached a high of approximately $10.00 per share before February 1, 2002, when the Securities and Exchange Commission filed suit against New Energy and suspended trading in New Energy stock.

Zolp pled guilty after a federal grand jury indicted him on three counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. His plea agreement stipulated to some sentencing factors, including a base offense level and several adjustments. The plea agreement did not, however, stipulate actual or intended loss from the fraud or the method of loss calculation under U.S.S.G. § 2B1.1. The

plea agreement also required Zolp to cooperate with the government in pursuit of other participants in the scheme to defraud, in exchange for which the government agreed to mention any such cooperation at sentencing and to move for a downward departure under U.S.S.G. § 5K1.1. Zolp provided extensive cooperation which resulted in the government apprehending Ernest Lampert, the orchestrator of the stock fraud. The government fulfilled its bargain by moving for a six-level downward departure in Zolp's sentence.

Following entry of the guilty plea, the district judge sentenced Zolp to 72 months imprisonment, three years of supervised release, and a $100 special assessment. This sentence included an upward departure under U.S.S.G. § 2B1.1 for financial loss inflicted by the fraud. The district court did not grant the government's requested departure pursuant to U.S.S.G. § 5K1.1, but, instead, in consideration of Zolp's cooperation with the government, exercised its discretion under *United States v. Booker*, 543 U.S. 220 (2005) and reduced his overall sentence by four years.

## JURISDICTION AND STANDARD OF REVIEW

The district court had original jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

We review the district court's interpretation of the sentencing guidelines *de novo*, its application of the guidelines to the facts of the case for abuse of discretion, and its factual findings for clear error. *United States v. Kimbrew*, 406 F.3d 1149, 1151 (9th Cir. 2005) (citation omitted).

## DISCUSSION

### I.

### A.

The government sought an enhancement of Zolp's base offense level under U.S.S.G. § 2B1.1, which permits an increase determined by the financial loss caused by the fraud. The district court's determination of loss is a finding of fact to which we must give "appropriate deference," *see* U.S.S.G. § 2B1.1, cmt. n.3(C), and which we review for clear error, *see United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004). Nevertheless, the government bears the burden of proof on the facts underlying a sentence enhancement. *See United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (en banc) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof.") (citation omitted). Further, "where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard." *United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006) (internal citations omitted). The government does not contest that, under *Staten*, a clear and convincing standard applies here.

**[1]** The guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry. The guidelines do, however, offer several possible approaches to this calculation. The commentary to § 2B1.1 indicates that "loss" for this purpose is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(i). Intended loss is defined as "the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(ii). The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable esti-

mate of the loss based on the available information.[2] U.S.S.G. § 2B1.1, cmt. n.3(C); *United States v. Peyton*, 353 F.3d 1080, 1090 n.11 (9th Cir. 2003). If the court is unable to determine either actual or intended loss with sufficient certainty, it may rely on the defendant's personal gain from the fraud as an alternate measure of loss. U.S.S.G. § 2B1.1, cmt. n.3(B).

**[2]** In making a loss calculation in a case such as this, we must distinguish between fraud relating to a "sham" company and a "pump-and-dump" scheme involving an otherwise legitimate company. Prior cases—and common sense—suggest that a security could be literally worthless after the fraudulent scheme is exposed if the fraudulent scheme involves a "sham" company. If the company whose stock is sold does not legally exist or has no activities, assets, facilities, or any other source of value, that "company" has no underlying equity. Absent highly unusual circumstances, its stock would also be worthless. *See, e.g.*, *United States v. Mayo*, 646 F.2d 369, 374 (9th Cir. 1981) (purpose of conspiracy involving "sham corporations" was "bilking the unsuspecting public by foisting worthless stock upon it"). In such a case, the court could appropriately determine the loss to be equal to the value of all outstanding shares before the fraud came to light.[3]

**[3]** Measurement of loss becomes considerably more complex, however, when the court confronts a "pump-and-dump" scheme involving an otherwise legitimate company. In such a case, because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not

---

[2]The commentary to § 2B1.1 suggests five factors the court may consider in estimating the loss. The factors relevant to this case are the third ("the approximate number of victims multiplied by the average loss to each victim") and the fourth ("the reduction that resulted from the offense in the value of equity securities or other corporate assets"). U.S.S.G. §§ 2B1.1, cmt. n.3(C)(iii) and (iv).

[3]We do not suggest that this method of calculation would necessarily be appropriate in all cases involving a sham corporation. Each inquiry is highly dependent on the facts of the particular case.

assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes. *See United States v. Bakhit*, 218 F. Supp. 2d 1232 (C.D. Cal. 2002) (thoughtfully analyzing several approaches to this task). *See also* Eisenhofer, Jarvis, & Banko, *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation*, 59 Bus. Law. 1419 (2004) (discussing the challenges of such calculations in the context of civil securities fraud). *Cf. Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (requiring plaintiffs in civil securities fraud cases to establish a "causal connection between the material misrepresentation and the loss"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005) (construing and applying *Dura*).

## B.

With these principles in mind, we turn to the propriety of the district court's analysis in this case. While Zolp did not contest the applicability of a § 2B1.1 enhancement for financial loss, the pre-sentence report ("PSR"), the government, and Zolp each proposed a different method of calculating that loss. The PSR found that actual loss to the investors could not be determined, and, accordingly, recommended a calculation based on Zolp's personal gain from the fraudulent scheme. The government proposed an analysis based on intended loss from the transaction, taking the average price of the stock during the scheme (estimated at $6.383), assuming it to be valueless after the scheme became public ($0), and multiplying the difference by the total number of outstanding shares. Zolp also proposed an "intended loss" calculation, but with lesser values, because Zolp believed the stock continued to have value before, during, and after the fraud. The district court generally adopted the government's reasoning and explained its calculation as follows:

When you get to the calculations of what the loss was, the only rational calculation of loss the court can consider is the difference between what the stocks were sold for and what they're worth. The stocks sold or intended to be sold times the . . . average value of the stock. That being taken on defense representation of $5.03, would be . . . $18,485,250. Then from that you subtract the value of the stock. *And the stock really was worthless. It has no value at all.* So the court would find by clear and convincing evidence there is no question that the appropriate increase should be 20 levels because this is between seven and $20 million as far as loss is concerned.

(emphasis added). Zolp does not take issue with the district court's method of calculation.[4] Instead, Zolp argues that the district court's price differential was too great (and hence the upward enhancement too great), because the stock continued to have value during the fraud and even after the fraud came to light.

**[4]** From the scant evidence available in the record in this case, it does not appear that the companies involved in this case are entirely sham operations. For example, there is evidence in the record that MegaWatt, New Energy, and Ubetigolf were all real companies with actual states of incorporation; that MegaWatt occupied several floors of a hospital in Tijuana; that one of the participants in the scheme had a warehouse containing various parts; and, most importantly, that the SEC ended its suspension of trading in New Energy stock after the fraud came to light, allowing further trading of New Energy stock.[5]

---

[4]We therefore express no opinion on that issue.

[5]If the district court deemed the stock valueless because it could not be legally traded during the SEC's trading freeze, the court's decision was clearly erroneous. Where, as here, the record suggests that the suspension was lifted and normal trading resumed, the stock retained value during the freeze even though shareholders had to wait to sell any of their shares.

**[5]** While the trading volume of New Energy stock was low following the SEC's lifting of its suspension of trading, the trading volume was still greater than zero and the stock price also *rose* significantly through March and into April of 2002. The government argues that the stock nevertheless remained "worthless" because "the trading volume is close to zero." But close to zero is not zero, and the government therefore implicitly—if unintentionally—acknowledges that New Energy stock continued to have some value after the fraud came to light. Moreover, the government's subsequent assertion that "there was no market for New Energy Shares, and . . . the victim investors could not sell" is directly contradicted by evidence in the record demonstrating that substantial numbers of shares *did* sell after the fraud came to light.

**[6]** The government seeks to avoid this reality by arguing that the only investors actually able to sell shares after the fraud came to light were two co-participants in the fraudulent scheme—Lynn Stratford and Tor Ewald. For two reasons, this argument is unpersuasive. First, evidence in the record does not establish that both Stratford and Ewald were "insiders" in the fraudulent scheme; at most, it establishes that they had read the press releases discussed above before their public release. Second, even if they were both "insiders," the government has not established that the trading volume reflected on that chart is *entirely* due to sales by "insiders," nor is it necessarily the case that trade among insiders proves that the stock has no value. It was the government's burden to establish, by clear and convincing evidence, that there was "no market" for New Energy shares after the fraud came to light and after the SEC suspension was lifted. *See Ameline*, 409 F.3d at 1086; *Staten*, 466 F.3d at 717. The government has not met that burden here.

## II.

Although we vacate and remand on other grounds, the district court did not err by considering Zolp's cooperation as

part of its analysis under 18 U.S.C. § 3553(a) rather than as part of its advisory guidelines calculation. Even though *United States v. Booker* rendered the guidelines advisory, as part of its sentencing analysis under 18 U.S.C. § 3553(a), "the district court must calculate the guidelines range accurately. A misinterpretation of the guidelines by a district court effectively means that the district court has not properly consulted the guidelines" for purposes of its § 3553(a) analysis. *United States v. Mix*, 457 F.3d 906, 911 (9th Cir. 2006) (internal citations omitted). If the district court makes a material miscalculation in the advisory guidelines range, even after *Booker*, we must vacate the sentence and remand for resentencing. *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006).

[7] Under the policy statement on departures for substantial assistance to authorities, "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1.[6] Here, the government moved for a six-level downward departure under § 5K1.1 based on defendant's above-described cooperation. The district court declined to make a departure on this basis in its advisory guidelines calculation, explaining that "[t]he court feels on the cooperation of the defendant, I don't think that plays in the guidelines. That is significant to the court's discretion under 3553. But the guidelines, I have already told you what the guidelines are on it." As part of this § 3553(a) analysis, however, the district court reduced Zolp's sentence by a full four years.

---

[6]In determining any appropriate reduction, the policy statement further provides that the court may consider (1) the significance and usefulness of the defendant's assistance; (2) the "truthfulness, completeness, and reliability" of the information provided; (3) the "nature and extent" of the assistance, (4) any injury, danger, or risk to the defendant or his family resulting from the assistance; and (5) the timeliness of the assistance. U.S.S.G. § 5K1.1.

**[8]** The district court engaged in the correct analysis. In *United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006), we held that "the scheme of downward and upward 'departures' [is treated] as essentially replaced by the requirement that judges impose a 'reasonable' sentence." *Id.* at 986. Thus, "we . . . review the district court's application of the advisory sentencing guidelines only insofar as they do not involve departures." *Id.* at 987. While district courts may still consult the Sentencing Commission's considered judgment regarding the basis for an appropriate deviation, "any post-*Booker* decision to sentence outside of the applicable guidelines range is subject to a unitary review for reasonableness . . . ." *Id.* The district court's conclusion that it should consider Zolp's cooperation as a part of its analysis of the sentencing factors set forth in 18 U.S.C. § 3553(a) rather than under the now "anachronistic" departure regime, *Mohamed*, 459 F.3d at 987, is consistent with our precedent.

## CONCLUSION

The district court's factual finding that shares of New Energy stock were "worthless" after the fraud came to light was clearly erroneous; accordingly, we vacate the sentence and remand for resentencing consistent with this opinion.

**VACATED AND REMANDED**.