**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-3846
_____

UNITED STATES OF AMERICA,

v.

RICHARD J. MARGULIES,

Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2:08-cr-00736)
District Judge: Hon. Eduardo C. Robreno
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
July 11, 2011

Before:  SLOVITER, FUENTES and VANASKIE, *Circuit Judges*

(Filed: August 25, 2011)
_____

OPINION
_____

VANASKIE, *Circuit Judge*.

Richard Margulies appeals the 51-month sentence the District Court imposed after

he pleaded guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and

78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  Margulies contends that the District

Court made legal and factual errors in determining the amount of "intended loss" for the

1

purpose of calculating his offense level under U.S.S.G. § 2B1.1. He also contends that the District Court failed to appreciate its discretion to grant a downward departure on the ground that the offense level calculated under § 2B1.1 substantially overstates the seriousness of the offense. We reject both arguments and will affirm.

I.

As we write primarily for the parties, who are familiar with the facts and procedural history of this case, we will relate only those facts necessary to our analysis.

Margulies was the chief financial officer and a director of Advatech, Inc., a biotechnology company whose stock was publicly traded on the over-the-counter market. Margulies owned approximately 1,475,380 of the 5.6 million outstanding shares of Advatech. On May 21, 2008, Margulies met with Eduardo Rodriguez and Kevin Waltzer. Waltzer, a government informant, surreptitiously recorded the meeting. At the meeting, it was agreed that Margulies would pay Rodriguez and Waltzer to purchase and hold, or cause others to purchase and hold, Advatech stock in order to create artificial demand in the stock that would drive up its price. Margulies explained that, to avoid scrutiny, he wanted to move the stock price up slowly. He initially stated that they should keep the stock price, which was trading at 30 cents per share on May 21, 2008, between $1.00 and $1.50 per share. Margulies informed Waltzer and Rodriguez that he owned 30 percent of Advatech's stock but that he controlled the "float," or free trading stock, and assured them that "nobody's doing nothing [with the stock] we don't know about." (A. 15a.) Margulies further mentioned that between $100,000 to $200,000 of funding "would probably last us through our 211 filing and would fund one or two

2

studies." (A. 199a.) On a later recorded telephone call, Margulies stated that "our job is to have, without too much difficulty, a $2 or $3 stock so that if we have to go to Plan B and they start putting money in they have to put it in at higher prices." (S.A. 97.)

On June 11, 2008, Margulies informed Waltzer that an upcoming Advatech press release would announce an agreement with a major university, and that they should "move the stock up nice and slow so it doesn't look like we're a bunch of idiots." (S.A. 98.) The following day, Margulies told Waltzer that he was issuing the press release on June 16 and he expected it to create trading activity. On or about June 17 and 18, 2008, after Margulies informed Waltzer that the press release was publicly available, Waltzer, at Margulies's direction, caused purchases to be made of approximately 5,100 shares for a total price of approximately $5,000. On June 20 and 23, 2008, Margulies made two deposits of $520 each into a bank account as payment to Waltzer and Rodriguez for the buying activity.

On December 11, 2008, a grand jury in the Eastern District of Pennsylvania returned an indictment against Margulies, charging him with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Count Two). On December 15, 2008, Margulies was arrested and, after waiving his *Miranda* rights, acknowledged that he knew it was illegal to pay Waltzer to purchase Advatech stock, and that he had improperly provided Waltzer non-public press releases. On May 6, 2009, Margulies pleaded guilty to Count Two, and Count One was subsequently dismissed.

In computing Margulies's offense level under U.S.S.G. § 2B1.1, the Probation Office recommended an 18-level increase to the base offense level of 7 based on its determination that the intended loss – "the pecuniary harm that was intended to result from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(ii), – was more than $2.5 million but less than $7 million. *See id.* § 2B1.1(b)(1)(J). The intended loss figure of approximately $2,508,146 was calculated by multiplying $1.70 – the intended increase in the price per share[1] – by 1,475,380 – the number of Advatech shares that Margulies either owned or controlled. Thus, the intended loss was measured as the intended loss to shareholders who would have purchased Margulies's stock at an artificially inflated price. Margulies objected to this calculation on the ground that he had not been engaged in a "pump and dump" scheme, arguing that although he sought to fraudulently "pump" the price of Advatech stock, he did not intend to "dump" his shares at the fraudulently inflated price, and thus could not have intended a loss of over $2.5 million. Margulies argued that his purpose in artificially inflating Advatech's stock price was not to sell his shares at a profit, but rather to attract capital investment in Advatech so that the company could fund its research and development efforts.

On December 8, 2009 and March 2, 2010, the District Court held an evidentiary hearing on the contested issue of intended loss, at which the government presented the testimony of expert witness James Cangiano. On June 6, 2010, the District Court issued a memorandum in which it concluded that the government presented sufficient facts to

---

[1] The $1.70 intended per share increase to the stock represents the difference between the $0.30 per share price at the scheme's inception and the target price of at least $2.00.

prove by a preponderance of the evidence that Margulies intended to sell his Advatech stock after fraudulently inflating its price. The District Court acknowledged that Margulies "express[ed] a desire to induce approximately $100,000 to $200,000 of outside capital investment in Advatech." (A. 16a.) It, however, determined that Margulies failed to demonstrate that attracting capital investment was his "singular goal in completing the artificial stock inflation, rather than one component of the overall plan to inflate the price of the stock for an eventual dump." (A. 16a.) The District Court stated that "[c]ritical to [its] conclusion is Mr. Cangiano's expert testimony that an expression of intent to induce capital investment into a company is consistent with the practice of a '[p]ump and [d]ump' scheme and that none of the actions to which [Margulies] pleaded guilty would have resulted in a direct capital investment in Advatech." (A. 16a-17a.) The District Court accordingly concluded that Margulies's intended loss was more than $2.5 million but less than $7 million, warranting an 18-level increase to Margulies's offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(J).

In addition to the 18-level enhancement to the base offense level of 7, the District Court adopted the Probation Office's recommendation of a further 4-level increase because "the offense involved a violation of securities law and, at the time of the offense, the defendant was . . . an officer or a director of a publicly traded company." U.S.S.G. § 2B1.1(b)(17)(A). The District Court also applied a 3-level reduction to the offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). Margulies's total offense level, therefore, was 26, which, with his criminal history category of I, yielded an advisory guidelines range of 63 to 79 months.

Margulies moved for a downward departure pursuant to Application Note 19(C) to § 2B1.1, which authorizes downward departures in "cases in which the offense level determined under [§ 2B1.1] substantially overstates the seriousness of the offense." *Id.* § 2B1.1, Application Note 19(C). The District Court denied the motion, explaining that a downward departure for overstatement of the seriousness of the offense would effectively undermine the Court's finding that the intended loss of Margulies's offense was over $2.5 million dollars.

Ultimately, after considering the relevant 18 U.S.C. § 3553(a) sentencing factors, the District Court imposed a below-guidelines sentence of 51 months' imprisonment, 4 years of supervised release, a $12,500 fine, and a $100 special assessment. Margulies appeals his sentence.[2]

## II.

We will first address Margulies's challenge to the District Court's finding of intended loss under § 2B1.1(b). A district court's factual findings, including loss calculations under U.S.S.G. § 2B1.1, are reviewed for clear error. *United States v. Dullum*, 560 F.3d 133, 137 (3d Cir. 2009). A district court's interpretation and application of the sentencing guidelines, including the district court's methodology for calculating loss, are reviewed de novo. *United States v. DeJesus*, 347 F.3d 500, 505 (3d Cir. 2003); *United States v. Lige*, 635 F.3d 668, 670-71 (5th Cir. 2011).

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

Margulies raises both legal and factual challenges to the District Court's intended loss calculation. First, relying on *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007), Margulies contends that the District Court committed legal error in calculating the amount of intended loss. In *Zolp*, the Ninth Circuit considered the calculation of actual loss attributable to a defendant's "pump and dump" scheme. It held that in "pump and dump" schemes involving legitimate (as opposed to "sham") companies, because the company's stock continues to have value after the fraud is exposed, a court may not assume that the loss attributable to the scheme is equivalent to the full price that victims paid to purchase the stock. The Ninth Circuit explained that to determine loss in such cases a court must "disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *Id.* at 719. Margulies argues that because there would have been legitimate inflation in the price of Advatech stock resulting from Advatech's research agreement with a major university, in addition to the inflation caused by his fraudulent scheme, "the amount of 'intended loss' would have been significantly less than estimated by the district court." (Appellant's Br. at 17.) Because there is no evidence that Margulies objected to the District Court's intended loss calculation on this particular ground, we review only for plain error. *See United States v. Williams*, 464 F.3d 443, 445 (3d Cir. 2006).

In relying on *Zolp*, Margulies conflates intended loss with actual loss. *Zolp* recognizes that the inflation occurring in a stock price during a "pump and dump" scheme may not be fully attributable to the scheme and thus the per share "actual loss" to shareholders who purchased the stock prior to the fraud's disclosure may not equate to

7

the mere difference between the unmanipulated stock price at the inception of the scheme and the inflated price at which the stock was purchased. While we understand *Zolp*'s analysis in the context of calculating an amount of loss that actually occurred, we fail to see how it extends to calculating an amount of loss that a defendant intended. Moreover, to the extent Margulies is arguing that a $1.70 per share loss was not possible because, over the course of the scheme, the stock price would have increased for reasons unrelated to the fraud, this Court has made clear that "the government's burden is to prove intended, not possible, loss." *United States v. Geevers*, 226 F.3d 186, 192 (3d Cir. 2000). Accordingly, we cannot say that the District Court plainly erred in concluding that Margulies, in seeking to inflate the stock price from 30 cents per share to $2.00 per share, intended a $1.70 per share loss with respect to the 1,475,380 shares he owned or controlled.

Margulies further argues that the District Court improperly placed the burden on him to prove that he did not intend to sell his stock at the artificially inflated price and thus did not intend a loss of over $2.5 million dollars. Our cases make clear that although the government bears the burden of proving, by a preponderance of the evidence, the amount of loss supporting a sentence enhancement under § 2B1.1, once the government has made out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the government's loss figure is incomplete or inaccurate. *United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008) (citing *Geevers*, 226 F.3d at 193). In arguing that the District Court failed to place the burden of proof on the government, Margulies points to the District Court's statement that "Defendant has failed

to point to evidence of record to demonstrate that any intent to obtain capital investment in Advatech was mutually exclusive from his intent to sell his stock at the artificially inflated price." (A. 16a.) While this statement may suggest that the District Court placed the burden of proof on Margulies to prove that he did not intend a loss of over $2.5 million, when read in context, it is clear that the District Court was rather acknowledging that Margulies had failed to present evidence to rebut the government's prima facie case that Margulies intended a loss of over $2.5 million. Indeed, immediately following the District Court's statement that Margulies "failed to point to evidence of record" that he did not intend to sell his stock at the artificially inflated price, the District Court stated that "[c]ritical to the Court's conclusion is Mr. Cangiano's expert testimony that an expression of intent to induce capital investment into a company is consistent with the practice of a '[p]ump and [d]ump' scheme and that none of the actions to which Defendant pleaded guilty would have result in a direct capital investment in Advatech." (A. 16a-17a.) Thus, in stating that Margulies "failed to point to evidence of record to demonstrate that any intent to obtain capital investment in Advatech was mutually exclusive from his intent to sell his stock at the artificially inflated price" (A. 16a), the District Court was not, as Margulies contends, placing the burden of proof on him, but rather recognizing that he failed to meet the burden of production that had shifted to him once the government had made its prima facie showing that he intended a loss of over $2.5 million. Accordingly, we reject Margulies's claim that the District Court reversed the burden of proof.

9

In addition to his claims of legal error, Margulies contends that the District Court's intended loss calculation constitutes a clearly erroneous finding of fact. Margulies concedes that he intended a "pump" of Advatech stock, but submits that the court "merely inferred, without reliable evidence" that he intended an eventual dump of the artificially inflated shares. (Appellant's Br. at 19.) This Court, however, has observed that a district court, in determining a defendant's subjective intent for the purpose of determining intended loss, "can draw inferences from the nature of the crime that he sought to perpetrate." *Geevers*, 226 F.3d at 192. Here, the expert witness's testimony that the crime was consistent with a "pump and dump" scheme merely substantiated the natural inference from "the nature of the crime [Margulies] sought to perpetrate" that Margulies intended to dump his stock at an artificially inflated price.

Margulies emphasizes that the government's expert, in addition to testifying that his course of conduct was "consistent with" a "pump and dump" scheme, testified that it was also "consistent with" a scheme to "lure in outside investors." (A. 126a.) Margulies thus argues that the District Court's intended loss finding was "little more than a guess between possibilities" and was therefore clearly erroneous. (Appellant's Reply Br. at 4.) Even if Margulies is right that the District Court's intended loss calculation was merely a "guess between possibilities," it is well-established that a factfinder's choice between two permissible views of the evidence cannot be clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). Margulies has failed to show that the District Court's finding that he intended to dump all his shares at an artificially inflated price is

not a permissible view of the evidence, and we therefore cannot conclude that the District Court's intended loss calculation of over $2.5 million is clearly erroneous.

Lastly, we reject Margulies's contention that the District Court failed to appreciate its discretion to grant a downward departure where the offense level determined under § 2B1.1 substantially overstates the seriousness of the offense. Judge Robreno, referring to the motion for a downward departure, explicitly stated "while I have the discretion to grant it, I am going to deny it." (A. 263a.) We reject the notion that the District Court could have verbally expressed its awareness of its discretion to grant the departure in such plain language but not in actuality appreciated that discretion. *See United States v. Vargas*, 477 F.3d 94, 103 n.15 (3d Cir. 2007) ("It is usually enough for a court to simply state it is aware of its authority to depart, but that it chooses not to (or words to that effect)." (citing *United States v. Minutoli*, 374 F.3d 236, 239 (3d Cir. 2004))).

III.

For the foregoing reasons, we will affirm the judgment of the District Court.