**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

KENDALL TANKERSLEY, aka Sarah
Kendall Harvey; Kendall,
            *Defendant-Appellant.*

No. 07-30334

D.C. No.
CR-06-60071-ALA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
May 5, 2008—Portland, Oregon

Filed August 12, 2008

Before: Richard C. Tallman, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman

10377

**COUNSEL**

Gail K. Johnson, Smith and West, LLC, Denver, Colorado, for the appellant.

Stephen F. Peifer, Assistant U.S. Attorney, Portland, Oregon, for the appellee.

**OPINION**

TALLMAN, Circuit Judge:

Kendall Tankersley appeals a 41-month sentence imposed following her guilty plea to a three-count Information charging her with conspiracy to commit arson and destruction of an energy facility in violation of 18 U.S.C. § 371, aiding and abetting attempted arson in violation of 18 U.S.C. §§ 2 and 844(i), and aiding and abetting arson in violation of 18 U.S.C.

§ 844(i). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

From 1996 through 2001, activist groups known publicly as the Earth Liberation Front ("ELF") and the Animal Liberation Front ("ALF") committed arson and other crimes against government and private entities in several Western states. The groups' membership changed over the lifetime of the conspiracy but included as many as sixteen conspirators. Tankersley actively participated in both an attempted and a subsequently completed arson that destroyed the headquarters building of U.S. Forest Industries, Inc., a private timber company located in Medford, Oregon.

The district court imposed a sentencing enhancement for the commission of a "federal crime of terrorism," pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 3A1.4 (2000),[1] against several of Tankersley's co-defendants who targeted government property. The district court did not impose this enhancement on Tankersley because she targeted only private property. It did, however, impose a twelve-level upward departure pursuant to U.S.S.G. § 5K2.0, which had the effect of making her base offense level the same as if she had been subject to the terrorism enhancement.

Tankersley argues that her sentence is unreasonable and that the district court abused its discretion by imposing the upward departure. She argues that the terrorism enhancement should not apply to her because she did not target government property, and that the twelve-level upward departure amounts to an imposition of the terrorism enhancement. She argues that the district court is not empowered to depart upward based on what she frames as its disagreement with congressional policy concerning the applicability of the terrorism

---

[1] The parties stipulated that the 2000 version of the Sentencing Guidelines applied to these sentencing proceedings.

enhancement, and she argues that there were insufficient aggravating circumstances to remove her offense from the heartland of arson offenses.

We must decide whether a sentence outside the applicable advisory guidelines range is per se unreasonable when it is based on the district court's efforts to achieve sentencing parity between defendants who engaged in similar conduct: with some targeting government property and who were properly subject to the terrorism enhancement, and others targeting only private property who were not. We hold that such a sentence is not per se unreasonable. We also conclude that the district court did not clearly err by declining to apply a four-level downward adjustment for a minimal role in the offense. *See* U.S.S.G. § 3B1.2(a). In light of the district court's proper application of the statutory factors set forth in 18 U.S.C. § 3553(a), we hold that Tankersley's 41-month sentence is reasonable.

I

A

Over a five-year period beginning in October 1996 as many as sixteen individuals conspired to damage or destroy private and government property on behalf of ELF and ALF. The conspirators targeted government agencies and private entities they believed were responsible for degrading the environment through timber harvesting, cruelty to animals, and other means. The conspiracy covered multiple crimes in five Western states and resulted in tens of millions of dollars in damage.[2]

---

[2]As summarized by the district court, the offenses included:

arson of the Dutch Girl Dairy in Eugene, Oregon in December 1995; arson and attempted arson of the United States Forest Service (USFS) Ranger Station in Detroit, Oregon in October 1996; arson of the USFS Ranger Station in Oakridge, Oregon in October 1996; arson of Cavel West Meat Packing Plant in Redmond,

Following a ten-year investigation by local, state, and federal law enforcement agencies, federal indictments were returned in various United States district courts. The bulk of the prosecutions occurred in the District of Oregon with United States District Judge Ann L. Aiken presiding. After lengthy negotiations, all ten defendants agreed to proceed by way of criminal informations and pled guilty to conspiracy. Nine of the defendants also pled guilty to separate, substantive counts of arson and/or attempted arson. Three of those defendants have appealed their sentences. In this Opinion we address the arguments of Defendant-Appellant Kendall Tankersley.[3]

---

Oregon in July 1997; arson of the Bureau of Land Management (BLM) Wild Horse Corrals near Burns, Oregon in November 1997; arson of the United States Department of Agriculture Animal Plant Health Inspection Service and Animal Damage Control Facility in Olympia, Washington in June 1998; arson and attempted arson of Redwood Coast Trucking Company and Wayne Bare Trucking Company in Arcata, California in September 1998; attempted arson of the BLM Wild Horse Corrals near Rock Springs, Wyoming in October 1998; arson of a ski resort near Vail, Colorado in October 1998; arson of U.S. Forest Industries in Medford, Oregon in December 1998; arson of Childers Meat Company in Eugene, Oregon in May 1999; arson of a Boise Cascade office in Monmouth, Oregon in December 1999; destruction of a high-voltage energy tower near Bend, Oregon in December 1999; arson of the Eugene Police Department West Campus Public Safety Station in Eugene, Oregon in September 2000; arson of Superior Lumber Company in Glendale, Oregon in January 2001; arson of Romania Chevrolet Truck Center in Eugene, Oregon in March 2001; arson of Jefferson Poplar Farm in Clatskanie, Oregon in May 2001; arson of the University of Washington Horticulture Center in Seattle, Washington in May 2001; and arson of the BLM Litchfield Wild Horse and Burro Corrals near Susanville, California in October 2001.

[3]In Memorandum Dispositions filed simultaneously with this Opinion we affirm the sentences imposed by Judge Aiken on co-defendants Kevin Tubbs, No. 07-30250, and Jonathan Christopher Mark Paul, No. 07-30310.

B

Tankersley moved to Eugene, Oregon, in 1995 to attend the University of Oregon. Soon thereafter she began participating in timber protests. In 1997, she was convicted of disorderly conduct and obstructing governmental administration after blocking a forest road and climbing onto logging trucks in protest of a timber harvest in Josephine County, Oregon. Just over a year later, Tankersley was convicted of criminal trespass and providing false information to a police officer in connection with a protest at a Union Pacific rail yard.

It was during these early acts that Tankersley met and began dating Jacob Ferguson, a leader of ELF.[4] She told Ferguson about logging trucks in Humboldt County, California, that they could target for arson. And, in September 1998, the two placed incendiary devices under several of these logging trucks, destroying one at a cost of $40,000. The district court considered this information as relevant conduct in fashioning Tankersley's sentence, though neither Tankersley nor Ferguson was ever charged or convicted for these crimes. The district court accepted the facts in Tankersley's Presentence Report ("PSR") as true.

Three months later, Tankersley, Ferguson, and co-conspirator Kevin Tubbs agreed to target U.S. Forest Industries. The three participated in a "dry run" of the arson. Tankersley hid in a nearby ditch and acted as a lookout for Tubbs and Ferguson. Based on their reconnaissance, Tubbs, Tankersley, and Ferguson decided to recruit a fourth person.

On December 22, 1998, Tubbs, Ferguson, Tankersley, and the new recruit, Rebecca Rubin, drove to Medford, Oregon, in Tubbs's van. The van contained several white, five-gallon buckets filled with fuel. Tubbs dropped Tankersley off near

---

[4]Ferguson cooperated with the investigators after he was charged with multiple crimes relating to separate incidents.

her lookout position. She carried a two-way radio to communicate with her three co-conspirators. After the others placed the incendiary devices and set the timing devices, they fled the scene of the crime and met Tankersley at a nearby paint store before driving back to Eugene, Oregon.

Tankersley and Ferguson began to scour newspaper articles in search of information about a fire at U.S. Forest Industries. Ferguson eventually learned that the incendiary devices had failed to ignite properly. He asked Tankersley to drive back to Medford to retrieve the devices. Although Tankersley returned to U.S. Forest Industries with another person and saw the un-ignited devices, she decided not to retrieve them.

Tankersley and Ferguson tried again on December 27, 1998. Tankersley agreed to meet Ferguson in Ashland, Oregon. She helped him gather materials to prepare new timing mechanisms for the incendiary devices. Tankersley then drove Ferguson to the neighborhood surrounding U.S. Forest Industries; she watched Ferguson's infant son in the car while Ferguson set the new timing devices on the buckets of fuel. This time the devices properly ignited. After Ferguson returned, Tankersley drove him and his son back to Ashland. She then drove Ferguson's son to a hotel in Dunsmuir, California, and registered in a hotel under a false name. Ferguson joined Tankersley at the hotel later that night.

The next day Tankersley returned to Eugene. She visited Tubbs at his residence, and Tubbs and Ferguson showed her a copy of a media communiqué discussing the successful fire. In mid-January, Ferguson released the communiqué, which read:

Communiqué from the ELF for 12-26-98

Happy fucking new year from the Earth Liberation Front! To celebrate the holidays, we decided on a bonfire. Unfortunately for U.S. Forest Industries, it

> was at their corporate headquarters office in Med-
> ford, Oregon. On the foggy night after Christmas
> when everyone was digesting their turkey and pie,
> Santa[']s ELFs dropped two five gallon buckets of
> diesel/unleaded mix and a one gallon jug with ciga-
> rette delays; which proved to be more than enough
> to get this party started. And after forty to fifty fire-
> fighters showed up to our party, they were unable to
> salvage anything, costing these greedy bastards half
> a million dollars. This was done in retribution for all
> the wild forests and animals lost to feed the wallets
> of greedy fucks like Jerry Bramwell, U.S.F.I. presi-
> dent. This action is payback and it is a warning, to
> all others responsible we do not sleep and we won't
> quit. For the future generations we will fight back.

After the U.S. Forest Industries fire, Tankersley helped
research possible attacks on the U.S. Bureau of Land Manage-
ment wild horse facility in Litchfield, California, and Boise
Cascade Corporation's regional headquarters in Monmouth,
Oregon. Although both facilities were eventually destroyed
through arson, Tankersley did not further participate in setting
those fires.

Tankersley abandoned her active participation in the con-
spiracy sometime in 1999 and moved to Arcata, California, to
attend Humboldt State University. She obtained a molecular
biology degree in 2004 and moved to Flagstaff, Arizona, in
2005 to apply to medical schools. On December 7, 2005,
seven years after the U.S. Forest Industries arson, Tankersley
was arrested on a federal warrant in Flagstaff.

## C

Tankersley joined the other nine defendants in challenging
the government's suggested application of the terrorism
enhancement under U.S.S.G. § 3A1.4. The district court con-
ducted a joint hearing on May 15, 2007. It issued a 46-page

Memorandum Opinion on May 21, 2007, explaining its sentencing rationale.

The district court focused on the plain language of the Sentencing Guidelines enhancement. Section 3A1.4 provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

"Federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g). Section 2332b(g)(5) provides, in pertinent part:

[T]he term "Federal crime of terrorism" means an offense that—

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is in violation of section . . . 844(f)(2) or (3) (relating to arson and bombing of Government property risking or causing death), 844(i) (relating to arson and bombing of property used in interstate commerce) . . . .

The district court read the guidelines to mean that the terrorism enhancement applies only if the "offense of conviction involved or was intended to promote an enumerated offense intended to influence, affect, or retaliate against government conduct." *See also United States v. Graham*, 275 F.3d 490,

514-18 (6th Cir. 2001) (discussing the elements of the terrorism enhancement).

The district court also addressed the government's burden of proof. It noted that our case law states that, "when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction, due process requires that the government prove the facts underlying the enhancement by clear and convincing evidence." *United States v. Jordan*, 256 F.3d 922, 926 (9th Cir. 2001). Because application of the terrorism enhancement increased the guidelines range beyond the statutory maximum for some of the defendants, increased the offense level by more than four, and more than doubled the length of the sentence authorized by the initial guidelines range for all ten defendants, the district court concluded that application of the enhancement warranted a higher burden of proof. In other words, the district court held that the government had to present "clear and convincing evidence that defendants' offenses of conviction involved or were intended to promote 'federal crimes of terrorism' as defined under § 2332b(g)(5)(B)."[5]

Having provided the defendants with a detailed explanation of how it intended to apply the terrorism enhancement, the district court then reminded the defendants of its ability to adjust the sentence based on other factors. Specifically, it advised the defendants that "[r]egardless of whether the enhancement technically applies, the court retains discretion to depart upward or downward in determining the appropriate sentencing range and to impose a sentence that takes into account the nature and circumstances of the offenses and the history and characteristics of each defendant." *See* 18 U.S.C. § 3553(a); U.S.S.G. § 5K2.0.

---

[5]The government does not challenge the district court's application of the clear and convincing evidence standard. We assume, without deciding, that the district court applied the correct standard.

D

We turn now to Tankersley's individual sentencing pro-
ceedings. The PSR calculated a total offense level of 28. The
three counts were grouped together under U.S.S.G. § 3D1.2,
resulting in a base offense level of six. The PSR calculated the
actual loss caused by the arson at $990,220, equating to a
thirteen-level increase under U.S.S.G. § 2B1.3. It also recom-
mended a two-level increase under § 2B1.3(b)(3) because the
offense involved more than minimal planning, but awarded
Tankersley a two-level decrease as a minor participant, *see*
U.S.S.G. § 3B1.2(b). The probation officer rejected Tankers-
ley's request for a minimal role adjustment—a four-level
decrease—"because she had considerable knowledge of the
arson and her involvement in both incidents was necessary for
the execution of the offense." The PSR also applied the terror-
ism enhancement—a twelve-level increase—due to the proba-
tion officer's conclusion that Tankersley's crime was intended
to promote a federal crime of terrorism. After a three-level
reduction for acceptance of responsibility, the PSR's recom-
mended total offense level was 28.

Tankersley objected to several of the factual determinations
made in the PSR. Tankersley contested the PSR's character-
ization of her involvement in the conspiracy. She complained
that she never identified herself as a part of either ELF or
ALF and that the PSR failed to state the limited time frame
during which she was involved—from autumn of 1998 to Jan-
uary 1999. Moreover, Tankersley disputed the PSR's failure
to state that she never participated in the "Book Club" meet-
ings of the other conspirators.[6] Tankersley also claimed that

---

[6]Many of the conspirators attended and participated in "Book Club"
meetings held in four different states. The Book Club was the moniker for
a select sub-group of co-conspirators who set direction for the groups'
criminal actions and tactics. The district court further explained in its
Memorandum Opinion on sentencing issues:

   Topics at the Book Club meetings included lock-picking, com-
   puter security, reconnaissance of targeted property, and the man-

the PSR failed to include information regarding her relationship with her boyfriend, Ferguson, who she claimed greatly influenced her decision to participate in these offenses. Finally, she argued that the PSR overstates her involvement in the U.S. Forest Industries arson when compared to co-conspirator Tubbs.

In an addendum, the probation officer recognized Tankersley's objections to some of the factual characterizations made in the PSR. Nevertheless, the addendum offered no changes as the information contained within the PSR "was taken from official reports" and "does not affect the guidelines calculations."

The district court held its first sentencing hearing for Tankersley on May 31, 2007. It calculated the base offense level at six, with a thirteen-level increase for the amount of loss and a two-level increase for more than minimal planning. It heard argument, took testimony, and accepted the probation officer's recommendation regarding the minimal role adjustment. The court applied a two-level downward adjustment for minor role, stating "I decline to adjust downward an additional two levels for minimal role in that when you had the choice, you went back. And that was after the device didn't ignite and you went [b]ack, and I just can't ignore that."

The district court concluded that the government failed to show by clear and convincing evidence that the U.S. Forest Industries arson was calculated to retaliate against government conduct.[7] The court noted that the communiqué issued

---

ufacture of timing devices to ignite improvised incendiary devices. The conspirators concealed their true identities by using code words and numbers, names, and nicknames, and by producing or obtaining false identification documents.

[7]In support of the application of the terrorism enhancement, the prosecutor presented evidence of a timber protest at the U.S. Forest Industries' headquarters approximately six months prior to the arson. The group was

after the arson stated that the offenders were targeting "greedy" corporations with no mention of government conduct. Nevertheless, the district court concluded that the guidelines "do not adequately take into account aggravating circumstances of the offense conduct." The district court felt that it needed to send a clear message that people will be held accountable for such "devastating" messages and actions. It concluded that the Sentencing Guidelines did not properly account for conduct directed at private individuals and/or entities.

In some ways, I would note, it is curious that the enhancement only applies to the offense that targets government conduct. And I say that as tongue in cheek, because, of course it makes a big difference to target government, to target the very essence of how we are governed.

But it also needs to be taken into account that we have to recognize using intimidation and violence against private individuals really isn't much different and really should not be in any way condoned.

At the same time, I do not necessarily think that they should be treated so dramatically different, and that is why I have routinely departed so that the message, because people are concrete thinkers, oh, can't torch government but we have a pass on private property. And given the concrete thinking out there,

protesting timber harvests in Colorado. Between 80 to 85% of U.S. Forest Industries' timber harvest contracts handled out of its Colorado office were with the United States Forest Service. Nevertheless, because the offenders discussed only "corporate greed" in their communiqué, the district court did not find by clear and convincing evidence that Tankersley sought to influence government conduct. The government does not challenge this finding on appeal.

> I just want to make sure they understand, one way or the other, that will be recognized and dealt with.
>
> Therefore, I find that 3A1.4 does not adequately take into account the defendant's intent to frighten, intimidate, and coerce private individuals at the U.S. Forest Industries through her actions. I therefore exercise my discretion under 5K2.0 to depart upward by 12 levels . . . .

The district court's decision to depart upward twelve levels resulted in an offense level of 31. It then granted a three-level downward adjustment for acceptance of responsibility. The government moved for an additional downward departure of four levels based on Tankersley's cooperation and substantial assistance. The court ultimately granted a five-level downward departure, balancing Tankersley's voluntary abandonment of the conspiracy and her productive life afterwards against the "incredible dangerousness of what was done and the damage and magnitude."

After the first sentencing hearing, the district court calculated Tankersley's total offense level at 23, resulting in a guidelines range of 46 to 57 months. The district court imposed a sentence of 46 months.

Tankersley promptly filed a motion to reopen her first sentencing, arguing that she had not been given adequate notice of the district court's intent to depart upward. The district court granted the motion to reopen and held a second sentencing hearing on August 3, 2007. In addition to questioning whether the district court had the authority to depart upward, Tankersley argued that a twelve-level upward departure was unwarranted as co-conspirator Tubbs received only a one-level upward departure. She also compared her sentence to that of co-conspirator Daniel Thurston, who received a 37-month sentence.

The district court addressed each of Tankersley's arguments in the second hearing. First, it stated that its intent in each case was "to upwardly depart so that the resulting offense level was the same as if the § 3A1.4 [terrorism] enhancement applied."[8] Because the enhancement had applied to some but not all of Tubbs's convictions, the district court needed to impose only a one-level upward departure to make the offense level the same as if the enhancement had applied to all of Tubbs's convictions.[9] It reiterated its purpose in departing upward:

> I found that it would not be fair or reasonable if some coconspirators received a 12-level enhancement under 3A1.4 while others did not simply because they targeted the conduct of private individuals rather than government.

> I think I alluded in the colloquy I had with counsel that in the context of this particular case, I think it's an indirect and direct relationship, and that's just a factor that in attempting to be fair and provide substantially similar sentences in this particular case, I have consistently followed as an analysis. And I'm going to follow it in this case.

---

[8]The district court applied only the twelve-level upward departure; it did not increase Tankersley's criminal history category to VI as provided for by the terrorism enhancement.

[9]Tubbs pled guilty to a 56-count information and received a sentence of 151 months. Tubbs's conviction stemmed from nine separate incidents of arson. During his sentencing proceedings, the district court concluded that § 3A1.4 applied to some of his convictions, but not others. It therefore exercised its discretion under U.S.S.G. § 5K2.0 to depart upward one level. The district court reasoned that § 3A1.4 "d[id] not adequately take into account the defendant's intent to frighten, intimidate, and coerce government and private individuals through his actions." The one level upward departure "result[ed] in the same offense level had the terrorism" enhancement applied to all of Tubbs's convictions.

> So the purpose of the conspiracy, the means, motives, intents, and actions to carry out those purposes were the same and should be treated similarly.
>
> . . .
>
> Upward departure, 5K2.0, again, I have the discretion to depart where the guidelines do not adequately take into account aggravating circumstances of the offense conduct. As I found before, I find that 3A1.4 does not adequately take into account the defendant's intent to frighten, intimidate, and coerce private individuals at the U.S. Forest Industries, through your actions. I exercise my discretion under 5K2.0 to depart upward by 12 levels, resulting in an offense level of 28, that resulting offense level that would have been applied had the enhancement in fact . . . been applied.

Second, the district court addressed Tankersley's comparison of her sentence to that of her co-conspirator Thurston, who received 37 months. The court noted that the government recommended a sentence of 37 months based on Thurston's substantial assistance and that the government was in a better position than the court to assess relative cooperation among those who offered information to mitigate their punishment. Moreover, Tankersley did not receive an upward departure for participating in the writing of the U.S. Forest Industries communiqué because, while relevant to determine the offenders' intent, the communiqué did not involve conduct that formed the basis for her conviction.

When imposing its sentence, the court noted Tankersley's willingness to remove herself from this conspiracy and move her life in a positive direction. It then restated the same guidelines calculations from the first hearing, but based on the factors set forth in 18 U.S.C. § 3553(a), it departed downward an additional level, resulting in a final range of 41 to 51 months.

The district court imposed a final sentence of 41 months, six months less than previously imposed.

## II

We review all sentencing decisions for an abuse of discretion, regardless of whether the district court applies a sentence inside or outside the suggested guidelines range. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing *Gall v. United States*, 128 S. Ct. 586, 597 (2007)). First, we must determine whether the district court properly calculated the applicable range under the advisory guidelines. *United States v. Mohamed*, 459 F.3d 979, 985 (9th Cir. 2006). "It [is] procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range." *Carty*, 520 F.3d at 993. We review de novo the district court's interpretation of the Sentencing Guidelines, and we review for clear error the district court's determination of the facts. *United States v. Barsumyan*, 517 F.3d 1154, 1157 (9th Cir. 2008). Second, we review the sentence for substantive reasonableness. *Carty*, 520 F.3d at 993; *Mohamed*, 459 F.3d at 985, 987.

## III

Tankersley contends that the district court erred by declining to apply a four-level downward adjustment for minimal role, instead applying only a two-level downward adjustment for minor role. We review for clear error the district court's determination that Tankersley does not qualify for minimal participant status. *See United States v. Johnson*, 297 F.3d 845, 874 (9th Cir. 2002). "[A] minimal participant is one who is clearly among the least culpable in a criminal group. *Id.* (citing U.S. Sentencing Guidelines Manual § 3B1.2(a), cmt. n.1 (1998)). Tankersley's culpability is measured against her co-participants and not an "average participant." *Id.* "[A] downward adjustment under § 3B1.2(a) is appropriate only if the defendant was at least 'substantially' less culpable than his co-participants." *Id.*

**[1]** "In determining whether a defendant was a minimal or a minor participant in any criminal activity, a district court . . . shall consider all conduct within the scope of § 1B1.3 (Relevant Conduct), not just conduct cited in the count of conviction." *United States v. Hatley*, 15 F.3d 856, 859 (9th Cir. 1994); *see also United States v. Rojas-Millan*, 234 F.3d 464, 473 (9th Cir. 2000) ("[District] courts [need] to look beyond the individuals brought before [them] to the overall criminal scheme when determining whether a particular defendant is a minor participant in the criminal scheme."); *United States v. Demers*, 13 F.3d 1381, 1383 (9th Cir. 1994) ("[A]ll relevant conduct within the meaning of § 1B1.3 may serve as the predicate for a downward adjustment."). Section 1B1.3 includes as relevant conduct "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). This is particularly appropriate when sentencing members of a pervasive and far-ranging criminal enterprise. Here, the court found that the conspirators "also formed 'cells' or groups that planned and carried out each arson." The cells then built the incendiary devices, researched and identified prospective targets, and practiced "dry runs." Some conspirators acted as "lookouts" while others planted the devices and accelerants at target sites.

The district court rejected the recommendation of the parties to grant a four-level downward adjustment. It stated that

> [b]ased on the recommendations of Probation, I also find a two-level downward adjustment for minor role. I decline to adjust downward an additional two levels for minimal role. In this instance, the defendant chose to return to the U.S. [Forest] Industries after the device did not ignite to ensure that a second arson attempt was successful.

In the PSR, the probation officer explained his reasoning for recommending a two-level adjustment:

> The CW [Cooperating Witness Jacob Ferguson] planned this arson with Ms. Tankersley. The CW assembled the incendiary devices, and placed them at the target site along with Ms. Rubin. Mr. Tubbs and Ms. Tankersley were lookouts. Mr. Tubbs was only involved in the attempted arson. Ms. Tankersley was less culpable than the CW. I will recommend a minor role adjustment instead of a minimal role, because she had considerable knowledge of the arson and her involvement in both incidents were necessary for the execution of the offense.

Tankersley argues that the district court's finding was clearly erroneous on three different grounds: (1) the district court made no findings comparing Tankersley's role relative to other participants; (2) the district court failed to view Tankersley's role in relation to the overall conspiracy; and (3) as a factual matter, Tankersley played a minimal role rather than a minor role in the offense. We reject her arguments based on our review of the record.

[2] The district court expressly adopted the recommendation provided in the PSR, and the probation officer specifically discussed Tankersley's involvement in the offense as compared to the other participants of the U.S. Forest Industries arson. Tankersley ignores the fact that the district court conducted ten different sentencing hearings stemming from this eco-terrorism conspiracy. The court carefully examined evidence of the pervasive criminal behavior present here and found conspirators like Tankersley liable for jointly undertaken conduct by others that was reasonably foreseeable in furtherance of the overall conspiracy. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Riley*, 335 F.3d 919, 928-29 (9th Cir. 2003); *United States v. Bynum*, 327 F.3d 986, 993 (9th Cir. 2003); *United States v. Gamez*, 301 F.3d 1138, 1146-48 (9th Cir. 2002); *United States v. Whitecotton*, 142 F.3d 1194, 1198-99 (9th Cir. 1998). It went to great lengths to determine each co-conspirator's overall culpability and

impose a fair and equitable sentence. *See Hatley*, 15 F.3d at 860 ("[I]t is clear from the record that the court did not limit the scope of the inquiry to the count of conviction."). In light of the fact that the minimal role adjustment applies only to those that are "substantially" less culpable, we can readily deduce from this record that, through this multiple sentencing process, the district court considered Tankersley's culpability in relation to each participant and imposed a fair and reasonable sentence based on her part in the overall criminal enterprise.[10]

[3] We find nothing in the record to suggest that the district court clearly erred by concluding that Tankersley played more than a minimal role. She had an opportunity to withdraw from the conspiracy after the first attempt to destroy U.S. Forest Industries failed. She did not withdraw, but went back again, and her participation in the second attempt was vital to its success. This particular fire caused almost one million dollars in damage and was a significant event in the overall success of the eco-terrorists' endeavors to deliver their message of intimidation and retaliation through acts directed against timber communities, tree farms, horse rendering plants, SUV dealerships, university research labs, government installations, and energy facilities. We therefore affirm the district

---

[10]Tankersley also argues that the district court failed to resolve certain factual discrepancies in the PSR that relate to her role as a minimal participant. In addition to declining to apply a minimal role adjustment—from which we can logically infer that the district court resolved all factual discrepancies in favor of the PSR—the district court expressly adopted the recommendation of the PSR. This was sufficient for the district court to satisfy its obligation under Federal Rule of Criminal Procedure 32. *Cf. United States v. Herrera-Rojas*, 243 F.3d 1139, 1143 (9th Cir. 2001) (stating that the court failed to satisfy Rule 32 when the district court "did not mention the PSR except to make it part of the record, did not adopt its reasoning, and did not mention the objections filed by Herrera-Rojas at all"). Moreover, when the district court asked Tankersley whether she had any other corrections with regards to the PSR, Tankersley responded in the negative.

court's decision not to grant a four-level downward adjustment for minimal role.

## IV

**[4]** Tankersley next argues that the district court's imposition of a twelve-level upward departure, based solely on the court's policy disagreement with the Sentencing Guidelines, renders the sentence unreasonable. We disagree. The Supreme Court in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), recently concluded that a "sentence outside the guidelines range is [not] per se unreasonable when it is based on a disagreement with the sentencing disparity for crack and powder cocaine offenses." *Id.* at 564 (internal quotation marks and alteration omitted). The Court reiterated that the Sentencing Guidelines "are advisory only," and therefore, a conclusion that a sentence was unreasonable solely because it was based on a disagreement with sentencing policy would render the Sentencing Guidelines "effectively mandatory." *Id.*

Tankersley tries to distinguish her case from *Kimbrough*, arguing that, in applying the twelve-level departure, the district court rejected a policy position mandated by Congress, not by the Sentencing Commission. *Cf. Kimbrough*, 128 S. Ct. at 570-574 (rejecting the argument that the 100-to-1 ratio was a "specific policy determinatio[n] that Congress has directed sentencing courts to observe" (alteration in original; internal quotation marks omitted)); *see also United States v. Gomez-Herrera*, 523 F.3d 554, 559 (5th Cir. 2008) ("*Kimbrough* . . . concerned a district court's ability to sentence in disagreement with Guideline policy, . . . [not] a district court's ability to sentence in disagreement with Congressional policy."). Her arguments are based on language found in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* Pub. L. No. 104-132, § 730. As a part of AEDPA, Congress directed the Sentencing Commission to amend § 3A1.4 so that it applies only to "federal crimes of terrorism" as defined in 18 U.S.C. § 2332b(g). *Id.*

Previously, the enhancement had applied only to a felony that "involves or is intended to promote international terrorism." Violent Crime Control and Enforcement Act of 1994, Pub. L. No. 103-322 § 120004 (1994).

The district court rejected Tankersley's argument, reasoning that "AEDPA's directive that § 3A1.4 apply 'only to federal crimes of terrorism' could be construed as requiring the replacement of the term 'international terrorism' with the term 'federal crime of terrorism'—just as the Sentencing Commission did." In other words, Congress did not specify through AEDPA that a district court could not upwardly depart for anything other than a "federal crime of terrorism," and nothing in AEPDA prohibits the Sentencing Commission from expanding the definition, or including a comparable sentencing enhancement, for similar terrorist acts directed at private conduct.

On appeal Tankersley cites legislative history in an effort to undermine the district court's reasoning. Tankersley acknowledges that by changing "international terrorism" to "federal crimes of terrorism" Congress sought to broaden the enhancement's application to domestic terrorism. *See* Deborah F. Buckman, Annotation, *Construction and Application of Federal Domestic Terrorism Sentencing Enhancement, U.S.S.G. § 3A1.4*, 186 A.L.R. Fed. 147, § 2(a) (2003). Nevertheless, in doing so Tankersley argues that Congress simultaneously created a narrow definition of terrorism " 'in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly not terrorist, and to adequately punish the terrorist for his offense.' " *Id.* (quoting H.R. Rep. No. 104-383, at 114 (1995)); *see also* H.R. Rep. No. 104-518, at 123 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 944, 956 ("This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element to be established at the sentencing phase of the prosecution . . . ."); *Graham*, 275 F.3d at 524-543

(Cohn, J., dissenting) (setting forth the legislative history of U.S.S.G. § 3A1.4).

In reviewing the legislative history of § 3A1.4, two things are clear, (1) Congress wanted to limit the application of the terrorism enhancement to only those crimes that involved or intended to promote a crime enumerated in § 2332b(g)(5)(B), and (2) Congress wanted to include an element of intent. The Conference Report on Senate Bill 735—the final form of the bill enacted into AEDPA—stated:

> This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. This section of the bill will make that new provision applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes with the necessary motivational element to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

H.R. Rep. No. 104-518, at 956 (1996) (Conf. Rep.).

**[5]** Based on this legislative history, we conclude that through the terrorism enhancement Congress wanted to impose a harsher punishment on any individual who committed an offense that involved or intended to promote one of the enumerated terrorist acts, and intended, through that offense, to influence the conduct of others. Nowhere in the legislative history do we find evidence of congressional intent to prohibit

the Sentencing Commission from promulgating a guideline that enhanced an offender's sentence based on that offender's intent to use terrorist activities to influence *private* conduct. *Cf. United States v. Rodriguez*, 527 F.3d 221, 229 (1st Cir. 2008) (noting that nothing in the PROTECT Act "forbids nor discourages the use of a particular sentencing rationale, and it says nothing about a district court's discretion to deviate from the guidelines based on a fast-track disparity"). We therefore hold that the district court's decision to depart—based on its desire to punish terrorist activities directed at private conduct in a manner similar to how it punished terrorist activities direct at government conduct—did not render Tankersley's sentence per se unreasonable.

V

**[6]** Tankersley also challenges the upward departure as being unwarranted under § 5K2.0 because there were no aggravating circumstances that were not adequately taken into consideration by the Sentencing Commission and because there was no evidence of harm sufficient to remove Tankersley's offense from the heartland of arson offenses. After *Booker*, the scheme of downward and upward departures has been replaced by the requirement that judges impose a reasonable sentence. *Mohamed*, 459 F.3d at 986. Where, as here, a district court frames its analysis in terms of a downward or upward departure, we treat the "so-called departure[ ] as an exercise of post-*Booker* discretion to sentence a defendant outside of the applicable guidelines range," and "any post-*Booker* decision to sentence outside of the applicable guidelines range is subject to a unitary review for reasonableness, no matter how the district court styles its sentencing decision." *Id.* at 987.

**[7]** The old departure scheme is relevant today only insofar as factors that might have supported (or not supported) a departure may tend to show that a non-guidelines sentence is (or is not) reasonable. *Id.* "[It] reflected the Sentencing Com-

mission's judgment about what types of considerations should or should not take a case out of the 'heartland of typical cases' such that an extra-guidelines sentence would be justified." *Id.* (quoting *Koon v. United States*, 518 U.S. 81, 94 (1996)).[11]

**[8]** In other words, we do not need to consider whether the district court correctly applied the departure provision in 4 A. 1.3§ 5K2.0; rather we review the district court's deviation from the applicable guidelines range for reasonableness. *Id.* at 989; *see also United States v. Johnson*, 427 F.3d 423, 425-27 (7th Cir. 2005) (reviewing the entire sentence for reasonableness rather than determining whether the district court correctly applied U.S.S.G. § 4A1.3).

---

[11]We are unpersuaded by Tankersley's argument that the Supreme Court's decision in *Irizarry v. United States*, ___ U.S. ___, 128 S. Ct. 2198 (2008), and our subsequent decision in *United States v. Evans-Martinez*, ___ F.3d ___, No. 05-10280, 2008 WL 2599758 (9th Cir. July 2, 2008), have somehow undermined our reasoning in *Mohamed*. *Mohamed* discusses our approach to reviewing post-*Booker* sentences. 459 F.3d at 984. In *Irizarry*, the Supreme Court held that the notice requirement in Federal Rule of Criminal Procedure 32(h) did not apply to a district court's decision to vary from the guideline range under 18 U.S.C. § 3553(a). 128 S. Ct. 2198, 2202-04. In *Evans-Martinez*, we held that, post-*Booker*, a district court is still required under Rule 32(h) to provide notice of its intent to "depart" from the guideline range. 2008 WL 2599758, at *3. Neither decision affects how we will review the substance of a post-*Booker* sentence for reasonableness. They address only the level of notice due to a defendant prior to a court's decision to sentence outside a suggested guideline range. As we stated in *Mohamed*, the district court does not have to ignore the pre-*Booker* system of departures. 459 F.3d at 987. *Evans-Martinez* requires the district court to notify the defendant when it plans on citing a departure provision to support its sentencing decision, but *Evans-Martinez* does not change how we, as an appellate court, will review for reasonableness a non-guidelines sentence. Because the district court granted Tankersley's motion and held a second sentencing hearing, she had all the notice we required in *Evans-Martinez* of the district court's intent to sentence her on the grounds we now uphold. *Irizarry* certainly requires no more, and, as discussed below, the ultimate sentence is reasonable under *Mohamed*.

## VI

**[9]** We next consider whether Tankersley's 41-month sentence is reasonable. The district court must "examine[ ] the final advisory sentencing range dictated by the Guidelines in light of all relevant § 3553(a) factors and 'the particular circumstances of [the defendant]'s case.' " *Barsumyan*, 517 F.3d at 1159 (alteration in original) (quoting *Kimbrough*, 128 S. Ct. at 576).**[12]** The district court is charged with the responsibility of imposing a sentence that is "sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (quoting 18 U.S.C. § 3553(a)). In doing so, the district court was understandably concerned by the gravity of the criminal conduct with which it was confronted in these cases.

**[10]** During both sentencing hearings for Tankersley, the district court discussed several of the § 3553(a) factors, including the nature and circumstance of the offense, § 3553(a)(1), the need for "adequate deterrence to criminal conduct," § 3553(a)(2)(B), as well as "the need to avoid unwarranted sentence disparities," § 3553(a)(6). The court concluded that the communiqué issued after the U.S. Forest Industries arson conveyed "a devastating message." Tankers-

---

**[12]**In *Barsumyan*, we stated that a policy-based deviation from the Sentencing Guidelines must come after the court has calculated and examined the final advisory sentencing range. 517 F.3d at 1158-59. Our concern in *Barsumyan* was the defendant's suggestion that we should "perform a sort of mini-*Booker* reasonableness determination at each step in determining the Sentencing Guidelines offense level." *Id.* at 1158. Here, unlike the situations presented in either *Barsumyan* or *Kimbrough*, the district court cited its departure authority under U.S.S.G. § 5K2.0, rather than 18 U.S.C. § 3553(a), when making its policy-based departure. It therefore necessarily made its policy-based decision while in the process of calculating Tankersley's advisory guidelines range. Nevertheless, the procedural difference between Tankersley's sentencing and the one contemplated by *Barsumyan* is of no consequence because, as we stated in *Mohamed*, we will treat an upward departure "as an exercise of post-*Booker* discretion to sentence a defendant outside of the applicable guidelines range." 459 F.3d at 987. We therefore review the whole sentence for reasonableness.

ley herself—and the enterprise as a whole—spent a substantial amount of time promoting these types of activities and injecting fear into governmental and private entities. As such, the court found compelling the need to deter. It reasoned that "down the road, people need to know, when these messages and actions are taken, they will be held accountable."

Additionally, the district court concluded that Tankersley's intent to influence private individuals through intimidation and violence separated her offense from mine-run arson cases. It found that Tankersley's "intent to frighten, intimidate, and coerce private individuals" warranted a greater sentence. The court also sought to avoid unwarranted sentence disparities with defendants for whom the terrorism enhancement applied, given its conclusion that terrorist activities directed at private individuals should not be treated differently than terrorist activities directed at government conduct.

We find unavailing Tankersley's citation to *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), to support her argument that the district court improperly relied on the need to avoid sentence disparities to support its departure. In *Abu Ali*, the Fourth Circuit determined that the district court erred when it significantly relied on the need to avoid an unwarranted sentence disparity between the defendant, a person affiliated with an al-Queda terrorist cell that planned to carry out a number of terrorist acts in the United States, and Jon Walker Lindh, Timothy McVeigh, and Terry Nichols. *Id.* at 262-66. Unlike in *Abu Ali*, the district court here considered the sentences of co-defendants who participated in the same conspiracy for the same purposes.[13] *Cf. id.* at 262-63. Addi-

---

[13]Each co-conspirator admitted that

[t]he primary purposes of the conspiracy were to influence and affect the conduct of government, commerce, private business and others in the civilian population by means of force, violence, sabotage, destruction of property, intimidation and coercion, and by similar means to retaliate against the conduct of government,

tionally, each of the co-defendants was similarly situated in that they had entered plea agreements and had accepted responsibility. Such comparison of co-defendants led the district court to conclude that, given the objectives of the criminal conspiracy, those co-defendants for whom the terrorism enhancement did not directly apply should not be treated differently from those co-defendants for whom the terrorism enhancement was applicable.

**[11]** After concluding that the nature and circumstance of Tankersley's offense warranted a departure above the advisory guidelines range, the district court next considered Tankersley's mitigating circumstances. Among other things, the court considered Tankersley's subsequent behavior, her voluntary withdrawal from the conspiracy, her school work, her community-based work, and her expressed remorse. During the first sentencing hearing the district court concluded that these mitigating factors warranted a downward departure of five levels. However, the district court reconsidered its analysis, and after considering all of the same mitigating factors during the second sentencing hearing, the district court departed downward six-levels (an additional two levels beyond the government's recommendation). This resulted in a guidelines range of 41 to 51 months, for which the court imposed a sentence of 41 months.

**[12]** The district court sentenced ten individuals involved in this conspiracy. It carefully reviewed Tankersley's PSR, the parties' submissions, listened to testimony, and held two lengthy sentencing hearings for Tankersley alone. The district court fully considered Tankersley's subsequent behavior, and

---

commerce and private business. To achieve these purposes, some of the conspirators committed and attempted to commit acts potentially dangerous to human life and property that constituted violations of the criminal laws of the United States and of individual states.

the court's expectations that Tankersley, once having completed her sentence, will hopefully lead a productive, crime-free life. Nevertheless, the district court could not ignore the grave nature and aggravated circumstances of Tankersley's offense, the enormous destruction it caused, and the intent to harm and intimidate entire communities. The district court's sentence was well-reasoned and properly based on the § 3553(a) factors. We therefore conclude Tankersley's 41-month sentence is reasonable.

## VII

For the foregoing reasons, we hold that a sentence outside the applicable advisory guidelines range is not per se unreasonable when it is based on the district court's efforts to achieve sentencing parity between co-defendants who engaged in similar conduct, where some defendants were properly subject to a sentencing enhancement, and others were not.

**AFFIRMED**.